All right, Ms. Sazaw, I'd be happy to hear from you. I think it's time for you to begin your argument. Okay, good morning and may it please the court. My name is Alexandra Sazaw, for Petitioners Nelsa Rosa Hernandez-Cabrera and AJEH. Throughout this case, the Board of Immigration Appeals has misinterpreted and misconstrued the particular social groups underlying Ms. Hernandez-Cabrera's asylum claim, leading to a number of significant legal errors and abuses of discretion. Respondent does not defend the vast majority of these errors. Instead, respondent's primary argument on appeal is that the PSGs are impermissibly circular. That view is simply incorrect. Neither of Ms. Hernandez-Cabrera's proposed social groups makes any mention of harm or threatened harm. Instead, both groups consist of Honduran women in particular types of domestic relationships, regardless of whether those women are at any risk of harm. In other words, both groups exist independently of persecution. More importantly, however, the Board's entire analysis on this point amounts to a single sentence equating these groups with women who are subject to harm or threatened harm by their domestic partners, inciting to the Attorney General's decision in matter of AB. But AB did not create a categorical rule. Ms. Sazaw? Yes, Your Honor? With respect to the matter of AB and the anti-circularity requirement, do you agree that the AG's interpretation of that phrase, particular social group, warrants Chevron deference? Yes, Your Honor. We believe that matter of AB is entitled to We don't believe that matter of AB changed the circularity principle in any meaningful way. And we believe that even after matter of AB, the key responsibility of the Board is to conduct a case-by-case assessment of the asylum seeker's particular social group in the context of the asylum. So to establish a building block here, which is that we're dealing in the anti-circularity requirement with not just the interpretation of a single IJ, but we're dealing with an interpretation of the INA. And the executive branch does have a with regard to immigration policy, and that would be particularly true when we are dealing with an ambiguous phrase such as particular social group. I just want to make certain that the anti-circularity requirement and principle is established in immigration law and that the interpretation of the INA here is something to which courts should defer. Yes, Your Honor. We agree that the anti-circularity principle is well established in immigration law and that it is entitled to deference. I think the disagreement here is primarily with sort of the attempt to extend the anti-circularity principle beyond both what was established prior to matter of AB and as we understand matter of AB with that opinion. With respect to that final point that you made about the state of the law before the matter of AB, I agree with you that we need to look at the state of the law before the attorney general's analysis to the extent it changes anything. But I don't think it changes the requirement that your client had to establish certain elements of their claim for asylum. And so I want to focus on that for a moment. And it seems to me that irrespective of what matter of AB says that still had to show that she in fact was a member of these proposed PSGs and that these characteristics that define the group are in fact immutable and that in fact there was a nexus between the alleged PSGs and the persecution by the persecutor, in this case her former domestic partner. And I'm just not sure that there's evidence in the record that contradicts the findings with respect to immutability for one thing because although it took some time and I'm not minimizing the horrific nature of the abuse that your client suffered, she did in fact leave her partner. She's been away from him for a good number of years. So it's not clear that she remains a member of the proposed PSG and more that that membership is immutable. And second, it's not clear to me that the persecutor in this case had any inkling or interest in making any kind of a statement with respect to this social group. You just had a violent personal animus toward your client, but it's not clear to me how that makes out the elements of an immigration claim. So I guess that you and perhaps the government want to focus on the AG's opinion here, but don't we need to get down to brass tacks and see if the the principle and traditional elements of an asylum claim? Yes, your honor. So in order to succeed on her asylum claim, you're correct that Mr. Hernandez Cabrera needs to establish every element of the asylum claim. We believe that the evidence in the record is sufficient to do so. But part of what's going on here is that the board didn't in on some of these issues. And so the board never addressed, for example, immutability. And we believe that the board also did not fully address the nexus question. It's true that in its initial decision, the board found that there was no clear error with respect to the immigration judges finding that Mr. Garcia's motive was personal. But we believe the board sort of misunderstood or misstated the immigration judges finding on that point, because the board emphasized it was personal because he wanted to be in a domestic relationship with our client, which was not part of the immigration judges finding. And the board also never expressly endorsed the view that the particular social groups were not a reason for persecution. And so we believe that both with respect to immutability and nexus, those issues would need to be addressed by the board in the first instance on remand, most likely. Well, when you talk about what happened here, and a lot of the problems seem to be that the petitioner had some sort of problem with Garcia and that the personal relationship was not a good one. But that kind of thing must be happening all over the globe where two parties to a marriage or a household don't get along and have personal problems with one another. But I'm just not convinced that that's the kind of thing that the asylum statute is supposed to cover, because that would seem to me to be awfully broad. There must be millions of people, millions of couples all over the globe who have an acrimonious personal relationship. But I don't understand how that fits within the whole purpose of the asylum statute. Yes, Your Honor. And that is part of why it's so important that an asylum case be evaluated sort of in the context in which it emerges. And so a key piece of Ms. Hernandez-Cabrera's asylum claim is related to sort of Honduran culture and society. And so it may be the case that, you know, domestic violence are widespread. And, you know, sort of the widespread nature of the harm, of course, doesn't destroy an asylum claim. But an important piece of this is sort of the cultural attitudes that keep her in this relationship or that have put her in this relationship where she is viewed as property by her domestic partner and the fact that her partner is motivated by her membership in those groups. And also, you know, related to that, the inability and the unwillingness of the government to assist her and protect her from this type of harm. And so we're not advocating that the asylum law should cover every incident of domestic violence, but we do believe that this falls well within the established framework. I'm not understanding which episodes of domestic violence it should cover and which episodes it shouldn't. And when you talk about the characteristics of Honduran culture, that seems a bit vague and sort of a slippery inquiry to me. But I also have a problem here because the two groups that are proposed to us, one, the women who are unable to leave the domestic relationship and women who are viewed as chattel or property, that may, there may be some women in one of those groups who are not the victims of persecution, but it seems to me that the groups taken as a whole define at least in part persecution, which we never insisted has to purely physical. I don't understand when someone wants to leave a relationship and can't, abuse is very often the reason that they are not permitted to leave. And when somebody is viewed chattel or property, that sounds at least to me instinctively to be persecuted. I don't want to be in the position of saying that women who are forced to remain in a domestic relationship despite their desire to leave and that women who are viewed as property to me, that sounds an awful lot like persecution. I mean, just the common sense of it all, it's a degrading, persecutive relationship. And that is of course why I think you run into difficulties with the anti-circularity problem is that these two PSGs that you suggest, it seems to me that a lot of that is describing persecution as to why people are in these groups to begin with. So your honor, I agree that these relationships have difficulties and are not ideal. I think the essential point here though, is that persecution in the asylum context has sort of a very specific connotation and it involves extremes. And this court has addressed that in the past. Persecution does not always involve physical violence. It can involve threats of violence, but they have to be of a particular level of severity. And that's the reason why, you know, when we talk about one reason women might be unable to leave a relationship is economic dependence. And I apologize, it sounds like my time may have expired. Is it all right if I continue? I would like for you to finish your thought. Yes. So with respect to, for example, economic dependence, this court has recognized that economic deprivation can rise to the level of persecution, but only where it threatens the life or liberty of the individual. And so we would say that while sort of membership in these groups and in these types of domestic relationships may not be ideal, it does not rise to the level of persecution for asylum purposes until there is some further level of severe abuse for that reason. Excuse me a minute, but this is what I wanted to talk briefly to you about, because let's suppose that there are a number of women unable to leave a domestic relationship because of persecution, but there are others who may be because of economic dependency or whatever. But the AB is very specific on this point because it says specifically that the, it rejected the definition of a PSG defined in part by persecution. In other words, this exact point came up in AB and they said, well, it may not cover, the group may not have every member who was subject to persecution, but it has a large number of women who are subject to persecution. It's a large number and it's defined in part by persecution. And AB addresses that directly and says, that won't suffice to establish a PSG because the anti-circularity requirement requires independence from persecution. It has to exist, the group has to exist independently of the harm and it can't exist independently of the harm if it's defined in part by the harm. So when you read AB and if we owe some Chevron deference to that, AB is very specific on the fact that there has to be independence from the harm, which cannot be established if the harm is, if the PSG is defined in part by that very harm. And that, you know, that's what concerns me about your case in addition to points that Judge Diaz was raising as to whether this person is a member of that, even a member of that group. But I just, I worry that we're just trying to find some way to circumvent what was the clear requirement of AB and the way in which AB addressed that and I think rather than find a circumvention or look for a way to circumvention, I think we have to be faithful to what AB did. Now AB may not be the last word on this subject because if you have a new administration that comes in and they may interpret it, this PSG phrase and its ambiguity, they may interpret it in a different way. And I think we'd be required to respect that and to owe Chevron deference to that. But when you read AB, it's really clear on the need for independence of the harm. That's my, that's the problem I'm running into Ms. Sessler. I want to just be honest with it. You know, sure. And if I can quickly respond on a couple of points. You know, I understand, we understand matter of AB to have rejected the particular social group advanced in ARCG because it was effectively defined to include only women who were subject to domestic violence. But importantly, matter of AB did not create a categorical rule regarding groups using the phrase unable to leave. And matter of AB, the attorney general never said expressly that the issue was that the group was defined in part by the harm. And in fact, you know, at least two circuit courts have rejected that reading of matter of AB. And I think one strong piece of evidence that matter of AB did not intend to create a categorical rule against groups like the one my client is advancing is the fact that the attorney general did not deny the petitioner in that case, AB, asylum. Instead, he remanded back to the board to consider her group. And the group that AB had advanced was El Salvadoran women who are unable to leave their domestic relationships where they have children in common, which is a very similar formulation to the ARCG group. And so we believe that, you know, at a minimum, AB left open the requirement that the board actually consider the particular PSG to determine whether it's defined, effectively defined to include only women who have been subject to domestic violence. And we don't think that the board did that here or that its analysis was a second particular social group, the disputed property social group, which never really was analyzed by the immigration judge and was only mentioned by the board on its decision on the motion to reconsider. So we don't think AB forecloses this group. But the particular social group advanced in AB was almost identical to the particular social group advanced here, except that it was a Guatemalan woman as opposed to a Honduran woman. I mean, I think AB is just very close to being on point here because the group advanced as a particular social group was almost identical to what we have here. Can I ask one question? This is Judge Niemeyer. Before we have Ms. Sassler sit down, my question is, is the petitioner challenging the factual findings made by the agency? And in particular, three of them that I'm interested in is one, a finding that she had, the petitioner had left the group. The second, that the abuse, the IJ found that the abuse was on account of a personal animosity and not membership in any particular, any group, however defined. And third, that the government was not sufficiently implicated in this case, referring as an example that she didn't call the police and give the police an opportunity to respond. And that the notion that the police, it would be futile, was merely speculative. These were factual findings. And I'm wondering, are you challenging those findings? Yes, Your Honor, we are. And so with respect to, I'll start with the underlying. Isn't the standard on challenging factual findings an enormously steep burden? It is, Your Honor. But for some of these, we are challenging not just the factual findings, but- But on the factual findings, it seems to me, I think Judge Diaz started with this. It seems to me those factual findings take you out of any group that you're trying to define. And the causation, the on account of membership in those organizations and the police involvement, you have arguments to make, but these were findings made by the agency. And we've been told to leave those alone, except in the most exceptional circumstances. Well, Your Honor, I think with respect to the unable and unwilling inquiry, part of the problem is that the agency has not actually addressed all of the issues. And so they did make what they claimed to be a factual finding that her efforts to seek help would be, or that it was speculative whether or not she would have been able to get help. But the agency based that on an erroneous legal conclusion that failing to contact the police was fatal to her claim. No, I think they said that that was indicative of it. They said the did not contact the police is significant. As a result, the police were unable to demonstrate inability or unwillingness to protect. That's a lot different than saying, because she can contact the police, she wins. That because was never in any one of these opinions. Basically, that was an observation made. And the IJ went on to explain, maybe it was the BIA went on to explain that even looking at the conditions, it was totally speculative to assume the police would not respond. So you've advanced nothing except a legal argument that captains the finding and saying, because she didn't call the police, she satisfied her requirement. It was just the opposite. The agency said she did not call the police, which is indicative of the fact that it made an independent finding on that. Anyway, my point is, it is a finding and there is evidence in the record to support it. And the question is, why isn't the reviewing court? So we believe to the extent that there was a finding, the board didn't grapple appropriately with the record evidence. And we believe that because what the board what evidence did you put in other than the evidence in the record is one, she didn't call the police or make an attempt and two, the conditions recited in Honduras. And they addressed both those issues. That's the only evidence that was in there. And your burden is to establish that the government was unwilling or refused to participate. And there's just no evidence to suggest that. Especially your honor, our client testified before the immigration judge that she did not contact the police because Mr. Garcia told her that things would be worse for her if she were to contact the police. And that's his threat. That doesn't say a thing about the government. He's basically saying that if you call the police, I'm going to hit you harder, whatever, whatever the threat is. I mean, how's that affect whether the police would get involved? Well, that's whether or not she was required to contact the police in order to establish sure that was evidence in the record to indicate that she never gave the police a chance. And that's what that's the way the IJs treated it. And you have tried in your brief to make it a causation issue that the fact that she didn't call the police ergo, the government was involved in all the cases say that doesn't follow. But in this case, the IJ made a factual finding and saying that is indicative. She never gave the police a chance. And then they addressed the conditions in Honduras. Anyway, I have not seen your attack on these three findings, which I don't know quite how we should treat that she left the group that the abuse was on account of. And of course, that's the language of the statute on account of membership. The IJ found that the abuse was on account of personal domestic relationship. I thought I heard you say that you didn't think that the BIA had sufficiently grappled with the IJs findings and in fact, that perhaps neglected to address them. But, you know, I think with respect to the mutability and this nexus requirement, the BIA specifically highlighted  finding with respect to immutability and said that your client hadn't shown that she was unable to leave the relationship and thus was not a member of the proposed PSG. And then with respect to the nexus requirement quoted from the IJ's opinion, I think, or at least paraphrase it and found that not to be clearly erroneous finding of facts. So I'm having trouble like just understanding what it is that why we would send this case back in light of that evidentiary record. Yes, your honor. And so with respect to sort of the finding that she was able to leave the relationship, you know, I think we do challenge whether the evidence and the record supported that. But more broadly, the immigration... Excuse me. So what is the particular challenge in the record? It's clear, isn't it, that she did in fact leave in 2012, lived with her parents for a time, a number of years until she departed for the United States in 2015. So can you dispute that factual finding? So the fact that she left his home did not equate to leaving the relationship. And when she left his home, he continued to come to her parents' home nearly every weekend. He continued to threaten her and to attempt to sexually assault her. And he continued to address her as his woman, say that she belonged with him, and to threaten to take their child away. And we think that all of these sort of demonstrate that even though she was able to move from his she was not able to leave their relationship. And that's further reinforced by the fact that, you know, her own family continued to allow him into the home and told her that even after she had told them about the abuse, told her that she needed to make her decision about whether to be with him or not, even when she had made it clear that she had wanted to leave him. And so we think all of those facts... Isn't what you're describing persecution? Yes, so we think some of those amount to persecution, but we also believe... So doesn't that present a problem under the anti-circularity requirement? I mean, I think there are two problems here. One is, it seems that all of us are concerned that if we overturn the board here, we would be leading to a very broad holding that every instance of personal animosity between couples could potentially lead to an asylum claim. And that's a terribly broad holding. And then in order to describe what's the nature of what the personal relationship is and make it appear as bad as possible in order to establish the persecution prong of the asylum claim, the more you dig in and try to establish the persecution prong of the asylum claim, the more you run into the anti-circularity problem with regard to matter of A, B. So it seems that there are these dual problems. One, is your client even a member of the group? And if there's a member of the group by virtue of persecution or whatever, then that raises questions about whether we're running a B, B. I mean, they just seem multiple hurdles here to actually make out an asylum claim. But at this point, I'm going to ask Judge Niemeyer if he has any further questions. Paul, do you have any further questions? No, I'm fine. I've overstayed my welcome already. All right. Judge Diaz, do you have some further questions? I do not. I thank Ms. Sessla for her argument. All right. And you have some rebuttal time as well, Ms. Sessla. And let's hear the opposing argument from Ms. Greer. Good morning, your honors, and may it please the court. I'm Christina Greer on behalf of the As the panel has pointed out, asylum is a narrow form of relief that requires persecution on account of a protected ground. And this independent existence requirement gives full meaning to those terms, and particularly in the situation of a particular social group. The group must exist independently of the harm. And from the argument that I've heard today, it seems as though we're on the same page, that a group cannot be defined in part by harm. And so I'll move to sort of the main issue that was briefed about whether these phrases, unable to leave and viewed as property by their domestic partner, in this case, if these groups are defined independently of the harm. And we argue that they are not. First of all, for unable to leave, petitioner claims that it can theoretically refer to things that are not the harm. But at least in this situation, she has defined it by the harm. When asked why she could not leave, all of the factors she listed were related to the harm. None of them were these other theoretical things that she lists as why may not be able to leave in Honduras. So at least in her specific case, she is defining the group by the harm, because unable to leave is the harm. And this is even supported in her country conditions evidence at page 559 of the record, paragraph number 53. Before that, the declaration discusses different factors that could prevent them. Mr. Greer, I'm sorry. Can I just back up a little bit? So is it your view that even if a particular petitioner's situation is defined by the harm, that if the PSG is broader than that in the sense that in some instances it may not in fact be defined by the harm, that that doesn't matter? We looked at a particular circumstance with the petitioner? I don't think that's right, is it? It's not. But if the phrase such as unable to leave here could mean financial, could mean societal, could mean religious, and also could mean the harm, then the group itself is not defined independently of the harm. And here, looking at her circumstances, the only conclusion is that at least she, when she uses that phrase, is meaning the harm. And so that's how the phrase must be analyzed here. That sort of brings up another problem with the phrase unable to leave, and that is that it's incredibly vague. And so it's questionable whether it could pass the particularity requirement. Because even in briefing, it's not well defined what is meant by unable to leave. And so resorting to the fact here to shed light on what she means, unable to leave, to mean in her group preventing her from leaving. If it's all of these other factors, then she would not be a member of the group. She never cited financial reasons or anything else. She only cited harm by the partner because he wanted her to stay in the group, in the relationship. And so at least here, it must be at least partly defined by the harm. But in a situation where, let's say someone's unable to leave because of economic considerations, but still wants to define the group the way it's defined here, is it your view that the group would still be defined in part by the harm, as long as there are considerable number of members of the group that didn't leave because of the harm? In other words, do we take the group as a whole or do we take the group as defined by the individual circumstances of the particular petitioner? The group should be defined countrywide or society-wide. And so for this group, but we must, the way that it becomes a factual determination in a case-by-case adjudication is that we look to the facts in this case to see, and the evidence produced here to determine how the group is being defined. And it's the applicant's burden to demonstrate what the group is in that society. So here, her evidence points to harm. If you have somebody, let's say, who can't leave because of economic dependency, okay? The problem there is a different one from the problem here, because the economic dependency is not persecution. You see what I'm saying? When you look at the particular circumstances, if you find that an individual is unable to leave because of reasons not related to the harm, then there's a question about whether there's persecution. But if you find that someone is unable to leave because they're in an abusive relationship, then the group is defined, then that's defined by the harm. So what I'm saying is there are problems either way you turn it. I see what you're saying. And so it sounds as though what you're saying is the concept that a group cannot be defined by the harm at issue in the claim. If the harm at issue in the claim is financial, it depends, because as Petitioner stated, severe economic deprivation can be harm. And in fact, in her own country conditions evidence, in a report that begins at page 546, it discusses financial abuse and how that's part of the power and control wheel of domestic violence, which is what she claims is the harm in these cases. And so if it's financial abuse, that's part and parcel of the harm, according to her evidence. I understand what your discussion here, but my understanding of the social group that it has to pre-exist the abuse, the persecution, and it has to be particular. And the abuse, the persecution has to be on account of membership in that group. And it has to be motivated, so to speak, by it. It has to be one substantial cause for it. And the question is, if you, in the abstract, say unable to leave includes economic and includes persecution, accused abuse, it just may be too broad. We're supposed to be talking about a membership in a particular social group, and this has caused the courts a lot of difficulty. It has. And the board somewhat discussed this at page 4 of the record, when it says that these groups are amorphous, overbroad, diffuse, and subjective, because they could consist of persons of any age or background who suffered varying degrees of domestic violence. And sort of bringing in the view to property, you know, to what extent is one viewed as property? Does that just mean I see you as my spouse, or does that mean I believe that I have complete dominion over you in every aspect of your life? Same thing with unable to leave, with all of the different reasons that are cited. Again, even in briefings, there's no concrete definition of what does unable to leave mean in Honduras. For example, as I stated on page 559, paragraph 53, there are many different factors that are discussed as preventing women from leaving. And then it says that the few women who overcome these impediments and take steps to escape abusive relationships often find that they are still unable to do so because their batterers will not let them go. Since the batterer is driven by his unwavering belief that the woman is and should be under his complete control, any attempts to divorce him, move out of the house, or seek assistance from friends and family can cause the even here, at least, she is defining her group by the harm that she's claiming is, that is the basis of her claim. And all the... Ms. Greer, can I go back to the questions that I was focusing on with Ms. Daslow and Judge Neumark touched on this as well? I don't know that the government's brief spent sufficient or enough time talking about the particular record evidence and the fines of fact in this case. I understand the interest in wanting to talk about the matter of AB and defend the attorney general's position there, but why can't, why wouldn't the court be on solid footing by simply looking to this record evidence and saying, well, you know, as defined by the petitioner in this case, it seems clear that as early as 2012 and certainly today, she's no longer a member of that alleged particular social group. And that in fact, from the persecutor's point of view, there was no linking of this particular persecution to this alleged particular social group. And the petitioner failed to show that the government would not have acted to protect her if she had taken steps to invoke their authority. Why isn't that enough to resolve this case? Your Honor, it is. So when this case first came before us, we requested remand on those grounds and that remand was denied. We were hoping... Can I ask a question? I'm sorry. Why did you need a remand? What was the, I'm confessing my, I can't remember the particulars of the request, but tell me why you needed a remand given that record. So the reason for the remand was first of all, as petitioner pointed out, neither the immigration judge nor the board addressed the cognizability of the Zeudis property group. But additionally, there were other issues that we felt that would benefit from a clarifying decision by the board and specifically addressing that particular social group. And then when we went forward to briefing, we felt as though having thought remand on those grounds, that we would go forward on the stronger, what we saw as a stronger ground. But those findings are there. There was, for example, in the immutability context, which only deals with the unable to leave group, that the fact that she was able to leave, that is defensible. It was discussed in the context of immutability by the immigration judge. And the, but the board relied on that factual finding to draw the legal conclusion that she was able to leave and therefore was not a member. And so we believe that's entirely defensible. And in response to that, Ms. Hemslaw says that in fact, although she was physically removed from the relationship, that the persecutor continued to persecute her while she was in Honduras. And so as, you know, the point of fact, she was not in fact able to leave. But the fact that she departed and left for the United States and has since been away from her persecutor for a number of years now, doesn't that suggest that she's no longer, if she was at one point, there's no, certainly now that she's in the U.S. no longer a part of that group. Perhaps that any, those are not facts. The departing from the United States forward, those facts aren't part of the immigration judges or the board's decision on her being able to leave the group. That's a good point. Okay. I don't understand. It seems to me that there may be a number of narrower grounds to resolve this, whether she's a member of the group or not. The fact that the particular situation here is grounded in a personal quarrel, not any kind of persecution. In other words, there really does seem to be a mismatch between the group as defined and as the PSG that she was worn in her personal circumstances. Correct, your honor. And as to her being able to leave, that only resolves the membership in the unable to leave group, not the group of women viewed as property by their domestic partner. But that group also is, as you pointed out, defined by the harm. And the problem with, as you, as Judge Wilkinson, you pointed out, relying on the harm is the reason she was unable to leave reveals that the group here at least is defined by the harm. Because her reason for not being able to leave was the harm. She said no other societal factors that made it to her society as a whole still saw her as being with Garcia. The only factor she cites is why she was unable to leave despite leaving his home is that he kept coming by. And so that reveals that in truth, this group is defined by the harm. And I think all of this, but this is a conundrum created. The agency rejected that argument. The agency pointed out that she did in fact leave to her mother's home. And even though the harassment continued thereafter, the harassment doesn't necessarily mean that Garcia and she are in a relationship. Their harassment suggests it's a threat of harm, but it doesn't mean she's a member of the group, but in a domestic relationship with him, she left that him in the relationship that they had, which was living together in a house. And that's what the board found. They said that she was able to leave. And then she was also able to leave Honduras to come to the United States, two decisions, which the board relied on to show she was not a member of the group. Correct. And she also counsel argued that, you know, her parents still allowed Garcia to come over and that even after she said she didn't want to be in the relationship, but they did tell her you need to make it clear whether you want to be in a relationship or not. So this was down to her decision, whether she would be continued to be in a domestic relationship. And as the board found, she left his home and she severed the relationship. So this doesn't, so judge, you're correct that she was able to leave the relationship and that is not a member of a group of women in a relationship that they're unable to leave. One of the other questions I had on a different point deals with that word particular. All of the other protected grounds in the asylum statute, race, ethnicity, religion, et cetera, they don't have that adjective that attaches to them. But this particular protected ground is preceded by the adjective particular. And so that suggests to me that the social group as it's defined shouldn't be vague. It shouldn't be diffuse. It ought to have some discernible contours to it. And one can think of discernible contours of a small social group living in some proximity to one another and the rest. But this is so vague. The members of the group don't know each other. The group is spread over a very large area. It's just so sprawling. And I wonder how that matches up with the word, with that adjective particular, which seems to me to suggest something more what we have here. That word has to be, I mean, so much of this is concentrating on the nexus requirement on account of or because of and not rendering that superfluous. And I understand that because that's been a staple of immigration law, the anti-circulation requirement, well before the AB decision and after both. But it's not just the word because of or on account of that are in danger of being seen as superfluous. It's also the And I don't know if this is cabin at all because you could substitute for this group, for example, you could put Guatemalan women unable to leave their domestic relationship or Japanese women unable to leave their domestic relationship or Swiss women unable to leave their domestic relationship. And pretty soon we've got a worldwide domestic relations court. And that, I don't see how that fits with what I understand to be rather focused. Um, the particular focus of the asylum statute was to lay for particular protected grounds and not let it become this vague. This is a problem that I have with what's being proposed here. I wonder what you think. Your honor, I agree that particularity is another issue here. So the way that the board and the attorney general have interpreted particular social groups is that the group, I believe I thank you. Your honor is that the group must be defined by a mutable characteristic. It must be particular and it must be socially distinct. So the two, what you were just discussing is sort of encapsulated by the particularity. The question is, are there definable boundaries such that we know who is and is not in the group? And that's where both unable to leave and viewed as property, come into conflict with that requirement. But in this case, the board didn't articulate that as a reason for denying the group. However, with unable to leave, even in the briefing here, petitioner argued that there are many reasons why a woman may be unable to leave and names many factors just to show and that shows that there really are no boundaries. It's unclear where those boundaries are such that is someone who's unable to leave just because they don't want to move, is that included within the group? Same thing as viewed as property, to what extent, you know, there could be some sort of feelings of proprietary relationship over just a spouse without any abuse at all. Would that be included in the group? But also social distinction gets to this question, which is, does the society at issue actually conceive of this to be a group? And the evidence in this case, there is nothing that says that Honduran women who are unable to leave their domestic relationship is seen as a group within Honduran society. And same with Honduran women who are viewed as property by their domestic partner. There's no evidence that that formulation is seen as a group within the society. And so those are two other issues, but the board did not grapple with those two in those terms, partially because in matter of AB, there's a statement where there's only, when a claim fails on one basis, the agency doesn't need to go into many more. So when it came to cognizability, there are some statements about a lack of particularity and social distinction, but the bulk of the finding is about lack of circularity and the agency did not quite go into this much detail on those two, but the government, you know, at least I agree with what you're stating, but it's not in these decisions. Yeah. It just seems to me that there are multiple problems here, but at any rate, whatever I'm going to, Judge Niemeyer, do you have any further questions of Ms. Greer? No, I'm fine. Thank you. Do you have some further questions? I do not. Thank you. All right. Ms. Greer, we thank you very much for your argument. We appreciate it. And Ms. Saslaw, you have some time in rebuttal. We'd be happy to hear from you. Yes, Your Honor. So I would like to start just circling back to sort of the prior round of questions regarding factual findings. And I would just like to emphasize with respect to those the unable to leave particular social group, and they did not address the viewed as property group. And so even if this court were to agree with some of the factual findings regarding the ability to leave or with respect to... Let me just interject here. The board seemed to say that the unable to of the risk of persecution. And it seemed to me they concluded that women in such characteristics, this is now addressing the group, with such characteristics appear to be those who are subject to harm or threatened by harm by their domestic partners, which is, of course, the having concluded that that was too amorphous, overbroad, diffuse, and subjective. Yes, Your Honor. So apologies. I meant specifically with respect to sort of these prior questions, but it's correct that on the motion to reconsider, the board addressed circularity with respect to the viewed as property group. And as we explained, we think that was incorrect, but also we think the board's analysis simply isn't sufficient to be evaluated. The board said that the group appeared to be women who are subject to domestic violence, but that group... But as we've explained, viewed as property can encompass women who have never been subject to domestic violence. So we don't think that follows naturally, and we think the evidence demonstrates ways that women might be viewed as property or treated that way that is not persecutory. The problem here, I keep coming back to it, is that the matter of AB anticipated this situation where there were some who were... ...subjected to harm and others in the group might not be subjected to the harm. But AB just says, and it's explicit on this point, is that it has to be independent of the harm. And it can't be independent of the harm if the group is defined in part by persecution. I mean, that's the exact... Matter of AB is not ambiguous on that point. It says the group has to be independent of the harm, and it's not independent of the harm if the harm is part of the definition. Even though it isn't harm in every case, the definition is still defined pretty significantly by harmfulness. When you're talking about people being unable to leave a relationship that they have, that is the harm, and it's incorporated into the definition. And what the proposed group is describing cannot be anything other than harmful. It's not beneficial in any way to have women engaged in those kinds of relationships where they can't leave if they want to, and where they're viewed as property. I think I'm very sympathetic on the idea that domestic abuse is a terrible thing. But I just don't see the legal argument from a variety of angles, whether one goes at it by the anti-circularity requirement, or whether it goes at it by the particularity and vagueness requirement, or whether it goes by the fact that there's a mismatch between the claimed group and the person's actual membership in that group. I think there are real difficulties there. And whether we are in danger of having a vague definition that expands to encompass a great many relationships defined by nothing other than personal tensions and acrimony, but there just seem to be a number of legal problems and legal issues. I think that domestic abuse is a terrible thing. But it seems to me that's for Congress to address. If it wants to broaden the asylum statute beyond the particular grounds, it can do this, or the Attorney General can change it and say, this is not a legitimate interpretation. AB was wrong. We overrule AB. A new administration could do that. But given the fact that Congress hasn't enacted to broaden the statute to this degree, given the fact that the Attorney General ruled as he did in AB, I just wonder whether we're really... I worry that we're engaged and we might be engaged in just a circumvention, an exercise of circumvention. And that troubles me just from the standpoint of the law. Yes, Your Honor. So to address, I think, your broad concern, I would emphasize what we're asking for here. If it's all right if I continue. It's fine for you to continue. Yes, indeed. Thank you, sir. What we're asking for here is for the board to articulate its basis and to look at the record and to make clear that it has looked at the record and considered all of these issues. And we think that because matter of AB, while the Attorney General did make a finding with respect to the particular social group in ARCG, even in AB, the Attorney General remanded Ms. AB's claim so that the board could assess, based on his opinion in AB, whether or not that particular social group was cognizable, whether it was impermissibly circular. So we think that it requires some level of actual analysis. And particularly here, where there is one of the two particular social groups has been largely ignored. And also, with respect to, I think, the broader discussion of circularity, one point that I'd like to emphasize is that while the Attorney General specifies that a particular social group must exist independently of the harm, what he actually said was that it must exist independently of the harm underlying the asylum claim, which is to say persecution. And in this case, both social groups, even if they, you know, involve some level of harm, which we don't think that they do. We think that they describe simply features of domestic relationships and recognized groups in Honduran society. But what they certainly don't include is the particular persecution underlying the asylum claim. And that's what distinguishes this case from some of the other cases that respondents cite in this brief. You know, I think importantly, the First Circuit in the Perez-Ravenales case distinguished between a particular social group involving the inability to leave and the particular social group in that case, which involved women who were unable to escape an abusive relationship. But in that case, the First Circuit is very strict on the anti-circulation requirement, and it says a sufficiently distinct social group must exist independent of the persecution claimed to have been suffered by the alien and must have existed before the alleged persecution began. So, you know, again, that is a, that case that you cite was very supportive of the anti-circularity requirement. So that's correct, Your Honor, but it did not find that the inability to leave posed a problem. It distinguished between a group like the unable to leave group, which does exist independent of even if no one in that group is ever abused, from a group that's defined specifically by abuse. And in fact... How do you say it exists? I mean, if you limit the group or you define the group without regard to domestic violence and just say the group consists of all women in Honduras who are unable to leave a relationship, a domestic relationship, you're including people who are subject to the divorce. It's a Catholic country and divorce may not be easy. There just may be tons of reasons. You're talking about a totally undefinable, unparticularized group. And so what the BIA did is assume that you were indicating that the reason that the petitioner was unable to leave was because of the domestic violence. And of course, that gets you into the problem of now the circular business that you've defined a group by domestic violence and that persecution was because of the persecution, which is circular. So it seems to me if you go back to where you seem to be going, which is the group is so broad to include all women unable to leave a domestic relationship, that is so broad and so undefinable and so amorphous. I'm not sure anybody in who's in that group as a particular matter and then persecute because of membership in that group. It places you a little bit on the horns of a dilemma. And I would think that setting aside legal advocacy, the natural proposition would be you're arguing that the petitioner here is a member of a group unable to leave a domestic relationship because of domestic violence. And of course, if that's the group, then when you charge the persecution because of that group, then you have the circular problem that AB defined. But the long and short of it, even the bigger picture, is you are really trying to elevate domestic spats, domestic fighting abuses into a cause for asylum. And I think the reason AB was written with such care was the ideas to try to say that's not the stuff of asylum law. Asylum law is persecution by reason of a membership in some defined entity. And here the persecution is basically domestic violence because of a domestic spat, not because she happens to be a member of some group. At least that's what the fact finding was. It's difficult for you, I understand, but the real question comes down to whether this is the type of case that the asylum statute was defined to address. And I think that's a difficult case. Judge Diaz, do you have any further questions? I don't. Thank you. Okay. I want to thank you very much for your argument. Ms. Greer, I want to thank you for your argument. The court appreciates both of your contributions. And we will adjourn court for the morning.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Albert Diaz